STATE OF VERMONT

| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 73-5-14 Vtec |
|---|---|
| Hinesburg Hannaford Wetland<br>Determination | DECISION ON THE MERITS |

Martin's Foods of South Burlington (Applicant) proposes to construct a 36,000-square-foot grocery store and 128-space parking lot (the Project) on Lot 15 of the Commerce Park subdivision in Hinesburg, Vermont (the Town).  This Project is the subject of seven different municipal and state appeals currently before this Court.  This decision relates to the Agency of Natural Resources' decision to reclassify the wetland on Lot 15 from Class II to Class III.  A group of Hinesburg residents (Appellants) have appealed the Agency of Natural Resources' wetland determination to this Court.  The Town is also a participant in this matter.

About 1.7 acres of Lot 15 is covered by a wetland.  As part of the Project, Applicant will fill a portion of the wetland.  In 2013, Applicant submitted a wetlands determination petition to the Agency of Natural Resources (ANR or the Agency), requesting that the Agency determine whether the wetland should be classified as Class II or Class III.  Class II wetlands are subject to ANR's permit requirements for any construction or filling activities in the wetland, whereas Class III wetlands are not.  After review, ANR determined the wetland on Lot 15 did not warrant a Class II designation and reclassified the wetland to Class III.  Appellants appealed that determination to this Court.

In anticipation of trial, pre-filed testimony was submitted by Applicant, Appellants, and ANR.  The Town did not pre-file testimony; however, it did offer testimony and evidence during trial.  The Court conducted a site visit on the morning of November 30, 2015.  A merits hearing at the Environmental Division in Burlington followed the site visit and continued through December 2, 2015.  At trial, Applicant was represented by Christopher D. Roy, Esq.; Appellants were represented by James A. Dumont, Esq.; ANR was represented by Leslie Welts, Esq. and

Jennifer S. Duggan, Esq.; and the Town was represented by Ernest M. Allen, III, Esq. Based upon the evidence presented at trial, which was put into context by the site visit, the Court renders the following findings of fact and conclusions of law.

## Findings of Fact

1. Lot 15 is one of fifteen lots in the Commerce Park subdivision in Hinesburg, Vermont. The subdivision is north of the Hinesburg Village center and is generally located in the triangle formed by Route 116, Patrick Brook (which parallels Commerce Street, the subdivision's primary road, to its north), and Mechanicsville Road.

2. Lot 15 is the last undeveloped lot in the Commerce Park subdivision.

3. Wetlands in Vermont are classified as Class I, II, or III.

4. Class I wetlands are the most significant and are designated through ANR's rulemaking process.

5. Class II wetlands are designated in three ways: 1) by being mapped as a Class II wetland on the Vermont Significant Wetland Inventory maps; 2) by meeting a presumption of significance outlined in the Vermont Wetland Rules (VWR), e.g., by being contiguous to wetlands shown on the Vermont Significant Wetlands Inventory maps or being larger than a half-acre in size; or 3) by ANR specially determining that the wetland warrants Class II protection under the VWR.

6. A Class III wetland meets the three criteria for wetland designation outlined in the VWR—soils, vegetation, and hydrology—but does not rise to the level of significance of a Class I or Class II wetland.

7. The wetland on Lot 15 is about 1.7 acres in size and thus was presumed to be a Class II wetland.

8. In order to develop the site, Applicant plans on filling in a portion of the wetland and installing stormwater management and other mitigation measures. A portion of the wetland will remain after the Project is completed.

9. According to the Vermont Wetland Rules (VWR), construction activities are prohibited in a Class I or Class II wetland unless they are authorized by a permit from ANR.

10. The VWR do not require a permit for construction activities in a Class III wetland.

2

11. In February of 2013, Applicant submitted a wetland determination petition for the Lot 15 wetland to ANR's Department of Environmental Conservation Wetlands Program.[1]

12. The petition was deemed complete on February 4, 2013.

13. Appellants opposed reclassification by writing letters to ANR and participating in hearings before the Agency through their attorney.

14. Agency personnel conducted two site visits with Applicant and its representatives.

15. Applicant did not permit Appellants to enter the property for these visits.

16. At two public meetings, Appellants presented expert testimony regarding the values served by the wetlands that they alleged would be harmed by the reclassification.

17. Appellants also submitted documents to ANR after the public hearings arguing why, under the Vermont Wetland Rules, the wetland at issue should remain a Class II wetland.

18. On April 2, 2014, ANR issued a written decision granting Applicant's petition and reclassifying the wetland as Class III.

19. Appellants requested that ANR reconsider this decision, and ANR denied the request to reconsider on May 7, 2014.

20. On May 27, 2014, Appellants appealed ANR's reclassification decision to this Court.

21. The appeal was given Docket Number 73-5-14 Vtec (Hannaford Wetlands Appeal).

22. The main body of the wetland on Lot 15 is in the southeastern portion of the lot.

23. The wetland is about 1.7 acres in size and is largely an open wet meadow. The wetland is surrounded by development and is occasionally mowed to control height of the grass that grows in the wetland and adjoining upland (non-wetland) areas.

24. Mechanicsville Road runs along the southeastern border of Lot 15.

25. A man-made canal separates Lot 15 from Mechanicsville Road.

26. A man-made berm forms the northern edge of the canal, and on the north side of the canal an elevated paved pedestrian path (the canal path) separates the wetland area from the canal.

27. The wetland is lower in elevation than the canal and does not drain into the canal.

---

[1] The Department of Environmental Conservation (DEC) is part of the Vermont Agency of Natural Resources.

28. The Lot 15 wetland is not adjacent to any navigable water.

29. To the north of the wetland, on the north side of Commerce Street, Patrick Brook runs in an east-west direction. The wetland drains into Patrick Brook through a series of ditches, swales, and culverts, but is physically separated from Patrick Brook by upland areas and by Commerce Street.

30. The wetland does not retain any open water areas.

31. The wetland vegetation is dense but is largely reed canary grass, an invasive species.

32. The wetland is predominantly flat, sloping slightly from the southeast to northwest.

33. The wetland lies within a "source protection area," i.e., an area that contributes to a drinking water source.

34. A thick clay layer below the soil surface of the wetland impedes surface water from draining into groundwater.

35. According to Town and Federal Emergency Management Agency (FEMA) mapping, the wetland is not within a flood hazard area.

36. There is ditching along the western edge and in the northwest corner of the wetland, which leads to a culvert under Commerce Street. The ditching and culvert are part of the original stormwater control measures installed for the Commerce Park subdivision. The wetland drains into Patrick Brook through this stormwater infrastructure. Applicant will upgrade the existing culvert under Commerce Street and a stormwater detention pond on the north side of Commerce Street as part of the Project.

37. Post-development, surface water flowing off the remaining portion of the wetland will be conveyed to Patrick Brook through the Project's stormwater system or through the existing stormwater infrastructure.

38. Most of the impervious surface in the Commerce Park subdivision is north and downgradient from the wetland; thus, most of the runoff from the subdivision flows away from Lot 15. Much of the stormwater from the subdivision reaches Patrick Brook through man-made ditches, swales, and culverts and does not pass through the wetland.

4

39. To the north of Lot 15 is the adjacent Dark Star property (Lot 11 and 12 of the Commerce Park subdivision). The Dark Star property has a history of flooding. The flooding on Dark Star exists largely because of site conditions independent of the Lot 15 wetland.

40. The main portion of the upgradient watershed is located to the northeast of the Lot 15 wetland. Much of the watershed is forested, and within the watershed there are large wetlands contiguous to streams that store a comparatively larger amount of floodwater than the Lot 15 wetland.

41. The Lot 15 wetland does not receive significant runoff from the surrounding watershed.

42. The existing development in the Commerce Park subdivision and ditching in and around the northwestern portion of the wetland has degraded the wetland.

43. The wetland is within the LaPlatte River watershed.

44. The Department of Environmental Conservation has identified the LaPlatte River as an impaired waterway because it exceeds acceptable E. coli bacteria levels under Vermont's water quality criteria.

45. Patrick Brook drains into the LaPlatte River.

46. The wetland is over half a mile away from the LaPlatte River.

47. There is no source of contamination near the wetland, and surface waters that enter the wetland are not contaminated with E. coli.

48. There are no Class A surface waters in Hinesburg.

49. Surface water from the wetland flows through a grass channel on Lot 11 before entering Patrick Brook. This channel also filters surface runoff.

50. There are no rare or threatened species that inhabit the wetland.

51. There is no hunting or fishing that occurs in or near the wetland.

52. The wetland does not provide any plants that can be harvested for food.

## Conclusions of Law

In February of 2013, Applicant submitted a wetland determination petition for the Lot 15 wetland to ANR. Soon thereafter, ANR personnel reviewed the submitted materials, and two ANR wetland scientists conducted site visits to the Lot 15 wetland. ANR issued a

determination on April 2, 2014, finding that the wetland was not significant and should be reclassified as a Class III wetland.  Appellants have appealed that determination here.

Appellants' Statement of Questions includes three questions with close to fifty subparts. Prior to trial, we granted ANR's motion for summary judgment on Appellants' Questions 1(A), 1(B), 1(C), 1(D), and 1(E), concluding: that, in this appeal, ANR's wetland determination was not rulemaking and thus properly subject to our de novo review; that our de novo review of ANR's wetland determination did not violate the separation of powers doctrine and was constitutional; and finally, that  alleged procedural defects in proceedings before ANR are cured by our de novo review, and therefore, no remand was necessary.  We also ordered Appellants to clarify Questions 2(a) and 2(b).  Appellants did not do so, and those questions are therefore **DISMISSED**.   Remaining are Appellants' Question 2(C) and Question 3 and its subparts. Question 2(C) asks whether Applicant can satisfy its burden of proof that the reclassification is lawful under the public trust doctrine.   Question 3 generally challenges ANR's decision to classify the wetland as a Class III rather than Class II wetland.

I.      The Public Trust Doctrine

Through Question 2(C), Appellants suggest that the reclassification of the wetland was unlawful under the public trust doctrine.  Appellants did not address this argument in their direct testimony or at trial, and the record is bereft of any case law or authority for Appellants' claim.   We therefore find this argument unsupported and conclude that the public trust doctrine is inapplicable to the wetland determination now before us.

While Appellants provide no authority, it appears they are referencing the "public trust" provision of 29 V.S.A. § 401.  Section 401 provides, "Lakes and ponds which are public waters of Vermont and the lands lying thereunder are a public trust, and it is the policy of the State that these waters and lands shall be managed to serve the public good . . . ."  As our Supreme Court explained, "The purpose of the doctrine is to preserve the public's interest in Vermont's *navigable* waterways." Parker v. Town of Milton, 169 Vt. 74, 79 (1998) (emphasis added).

No navigable water is implicated here.  The land is a wetland on a privately owned lot. We are not aware of any authority in Vermont suggesting that the Lot 15 wetland is encompassed within Section 401's public trust provision.  We therefore answer Appellants'

6

Question 2(C) by concluding that the Lot 15 wetland is not a "lake or pond, or land lying thereunder," and thus, the public trust doctrine does not apply.

II.     Significance of the Wetland on Lot 15

Appellants' primary challenge concerns ANR's determination that the wetland on Lot 15 is not significant. Wetlands in Vermont are classified as a Class I, II, or III (Class I being the most significant). Class I wetlands are designated through the Agency's rulemaking process. Class II wetlands are wetlands that are identified on the Vermont significant wetlands inventory map, or are wetlands the Agency determines warrant protection as a Class II wetland pursuant to 10 V.S.A. § 914. This determination is based on an evaluation of the functions and values set out in 10 V.S.A. § 905b(18)(A) and explained in more detail in Section 5 of the Vermont Wetland Rules (VWR). See VWR § 5, Code of Vt. Rules 12-004-056. In evaluating whether a wetland shall be Class II or Class III, Section 905b(18)(A) directs that ANR shall consider the extent that a wetland:

(i) provides temporary water storage for flood water and storm runoff;

(ii) contributes to the quality of surface and groundwater through chemical action;

(iii) naturally controls the effects of erosion and runoff, filtering silt, and organic matter;

(iv) contributes to the viability of fisheries by providing spawning, feeding, and general habitat for freshwater fish;

(v) provides habitat for breeding, feeding, resting, and shelter to both game and nongame species of wildlife;

(vi) provides stopover habitat for migratory birds;

(vii) contributes to an exemplary wetland natural community, in accordance with the rules of the Secretary;

(viii) provides for threatened and endangered species habitat;

(ix) provides valuable resources for education and research in natural sciences;

(x) provides direct and indirect recreational value and substantial economic benefits; and

(xi) contributes to the open-space character and overall beauty of the landscape.

7

ANR has also created a "Wetlands Evaluation Form" to aid Agency ecologists in implementing the required evaluation. See ANR Ex. 7. If ANR finds that a wetland does not provide one or more of the identified functions to a significant degree, it may designate the wetland as Class III.

According to Section 4.6 of the VWR, wet meadow type wetlands greater than 0.5 acres in size are presumed to be Class II wetlands "unless determined otherwise." The wetland on Lot 15 is over 0.5 an acre in size and is a wet meadow; thus, ANR initially presumed the wetland was Class II. In considering the wetland determination request, ANR personnel conducted two site visits, reviewed evidence submitted by Applicant, and conducted their own "desk top" review. Through this process, ANR identified two statutory functions provided by the Lot 15 wetland: i) water storage for flood water and stormwater runoff; and ii) water quality protection. Despite the presence of the two functions, ANR concluded that the functions were not provided to a significant degree. Accordingly, ANR determined that the wetland was not significant and therefore was appropriately designated a Class III wetland.

Appellants, through Question 3, challenge the finding of non-significance and the reclassification of the wetland as Class III. We interpret Question 3 as raising the following issues: 1) whether, in reviewing the significance of the wetland, the Court is bound by ANR's procedures and policies; 2) whether the evaluation provided was complete and accurate (i.e., whether ANR impermissibly departed from its regulations and procedures; 3) whether the functions listed in Section 5 of the VWR are present and significant in the Lot 15 wetland; and 4) if so, whether the presence of multiple functions requires the wetland to be designated as Class II. In response to Appellants' challenge to its determination, ANR submitted a pre-hearing memorandum arguing that their determination was entitled to deference and that Appellants had failed to demonstrate that ANR's conclusion was erroneous. In consideration of the matters raised by Appellants' Question 3, we must first address the level of deference appropriate for ANR's designation.

### a. Deference to Agency Determinations

ANR argues that its decision to reclassify the wetland is entitled to substantial deference because it involves an area within the Agency's expertise and because ANR reached its

conclusion by applying the Vermont Wetlands Evaluation Form and the VWR. ANR's assertion confuses the level of deference we apply to regulatory interpretation and the level of deference we apply to an agency's application its regulations to the facts.

We consider ANR's reclassification determination appealed here de novo. 10 V.S.A. § 8504(h). We therefore apply the substantive standards that were applicable to the Agency in its initial determination and consider anew all questions of law and fact as if no decision had been made. See V.R.E.C.P. 5(g); In re Entergy Nuclear Vermont Yankee Discharge Permit 3-1199, 2009 VT 124, ¶¶ 53–54, 187 Vt. 142. When reviewing an agency's determination de novo, we will generally give substantial deference to an agency's interpretation of its own regulations. See In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶ 15, 196 Vt. 467 (2014). Nevertheless, we give no deference to an agency's factual determinations and ultimate permit decision. Id. ¶ 11.

We therefore will defer to ANR's interpretation of the VWR. But ANR's application of the regulations to the facts, i.e., its factual determination that only two functions are present in the Lot 15 wetland and that those functions are non-significant, is afforded no deference.

b.      Should the Court override the Wetlands Evaluation Form?

Appellants have challenged the adequacy of the Wetlands Evaluation Form ANR uses to classify wetlands, arguing that we should apply New Hampshire's wetland evaluation method instead. As discussed above, while we owe no deference to ANR's ultimate determinations, we do defer to the Agency's interpretation of its authorizing statute and its own regulations. See In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶ 15, 196 Vt. 467 (2014). The Wetlands Evaluation Form is one such interpretation: it represents ANR's interpretation of the functions and values in Section 5 of the VWR. We defer to ANR's interpretation, especially given that Appellants have provided no evidence or argument that the Wetland Evaluation Form fails to account for the functions and values necessary for this wetland determination under the VWR. We therefore decline to override the Wetlands Evaluation Form, and we consider it an appropriate wetlands evaluation tool.

9

c.     Is this Court Bound by ANR's own Procedures and Policies (Question 3(a) and (b))?

As we stated above, pursuant to 10 V.S.A. § 8504(h), we consider ANR's determination de novo. This standard of review requires this Court to apply the substantive standards applicable to ANR and consider the facts and law as if no prior determination had been made. See § 8504(h); In re Entergy Nuclear, 2009 VT 124, ¶ 53.[2] Therefore, the substantive rules and regulations that bound ANR, including the standards embodied in its Wetlands Evaluation Form, also apply to our review of the wetland reclassification decision.[3]

d.     Was the Evaluation Complete, Accurate, and Proper (Question 3(c))?

Appellants' Question 3(c) appears to challenge whether the materials Applicant submitted to ANR were complete and accurate. Such a challenge is inappropriate for our review, as we are to consider the matter de novo. Alleged discrepancies that occurred below have no bearing on our analysis and do not provide grounds to deny a project. See Chioffi v. Winooski Zoning Bd., 151 Vt. 9, 11 (1989) ("A de novo trial 'is one where the case is heard as though no action whatever has been held prior thereto.'") (quoting In re Poole, 136 Vt. 242, 245 (1978)); see also In re Moore 3 Lot Subdivision, No. 123-9-13 Vtec, slip op. at 6 (Vt. Super. Ct. Envtl. Div. July, 28, 2014) (Walsh, J.) (explaining that when reviewing a matter de novo, we do not review "the accuracy or adequacy" of materials submitted below). We therefore interpret Appellants' Question 3(c) as challenging the adequacy and accuracy of the materials before this Court.[4]

---

[2] Appellants also ask whether we may override the Wetland Evaluation Form and apply New Hampshire's method instead (Question 3(b)). As previously explained, we defer to ANR's determination that the Wetland Evaluation Form accurately encompasses the functions and values in Section 5 of the VWR. Appellants have provided no evidence that the Wetland Evaluation Form fails to account for the functions and values necessary for this wetland determination under the VWR. Moreover, while the New Hampshire method may be considered in addition to the VWR, we are unaware of any authority permitting this Court to disregard the VWR entirely and only consider New Hampshire's method. We therefore answer Appellants' Question 3(b) in Applicant's favor.

[3] We are not aware of any policies that ANR may have considered. If the policy is not substantive, but rather only one of internal design, we are not bound by such a policy.

[4] Appellants argue that the VWR establish a presumption that the wetland is Class II, and thus Applicant and ANR must prove by a preponderance of the evidence that the wetland is not entitled to a Class II designation. There is no authority to impose such a burden on ANR or Applicant in this case. Section 4.6 of the VWR provides that the wetland is entitled to a presumption that it is a Class II wetland "unless determined otherwise." We therefore read section 4.6 to create a default of a Class II designation, but do not find that a heightened standard applies to the evidence needed to reclassify the wetland as Class III. Moreover, as we find the facts demonstrate

10

In their pre- and post-trial briefing, Appellants argue that ANR's evidence and assessment of the wetland is not credible for two reasons: 1) that ANR failed to conduct its own hydrogeological or hydrological assessment of the wetland's storage capacity and instead relied on flawed HydroCAD modeling by Applicant; and 2) that ANR based its conclusion that the wetland was degraded by ditching on the false premise that there was ditching across the main wetland body. We are unpersuaded by Appellants' arguments. The errors in Applicant's HydroCAD modeling that Appellants repeatedly point to do not impact the credibility or sufficiency of ANR's wetland determination. For one, these alleged errors relate to modeling of the 100-year post-development flood scenario. As Ms. Lapierre, ANR's wetlands ecologist, testified, even if Applicant's modeling understates the stormwater runoff from Lot 15 during a 100-year storm post-development, her assessment of the flood storage capacity of the wetland would not change because post-development models do not demonstrate the state of the wetland as it currently exists, and her assessment did not rely on Applicant's modeling to reach the conclusion that the flood storage capacity of the wetland was not significant. Further, according to the VWR, ANR, and this Court on review, are not required to consider hydrogeological or hydrological data in evaluating the flood storage function of a wetland. See VWR § 5.1.[5] To Appellants' second point, Ms. Lapierre did not rely on the fact that there is ditching across the main body of the wetland in finding the wetland was degraded. As her direct testimony clarified, the presence of reed canary grass throughout the wetland, the extensive development surrounding the wetland, and the ditching in the northwest corner of the lot were conditions that degraded the wetland.

Appellants' argument is largely a disagreement with ANR's factual conclusion. That disagreement, however, does not impact our de novo review and we are unconvinced the evidence before us is misleading or incomplete. Therefore, we answer Appellants' Question 3(c) and all its subparts with the conclusion that the evidence before us is not misleading or

---

that the wetland provides no function to a significant degree, we have "determined otherwise," thus overcoming any presumption.

[5] Section 5.1 specifies that, at a minimum, we are to consider three sub-functions in evaluating the wetland. In addition, in the last paragraph of the 5.1, it describes what data hydrologic models should include, but does not specify that they are mandatory. ANR has interpreted Section 5.1 to mean that hydrologic models may be used but are not required. There was no offer that this interpretation is clearly erroneous and we agree with this interpretation.

inaccurate. Considering the evidence provided, there is ample evidence for us to reach an informed and accurate decision regarding the wetland's significance.

e.    The Presence and Significance of the Wetland Functions

In response to Applicant's petition, ANR issued a wetland determination for the wetland on Lot 15 on April 2, 2014. ANR found that although the wetland's size gave it the presumption of significance, and although two functions or values were present in the wetland, no function or value was present at a significant level, and therefore, the wetland on Lot 15 should be classified as a Class III wetland. Appellants challenge ANR's finding that the wetland does not provide any function or value at a significant level, as well as the ultimate conclusion that the wetland should be classified as Class III. Through Question 3, Appellants appear to argue that many of the functions and values listed in Section 5 of the VWR are present and significant. At trial and in response to ANR's hearing memorandum, however, Appellants focused on the two functions identified by ANR; flood water storage and water quality protection, attempting to show that these functions were in fact present to a significant degree.

1.    Flood Storage

Here, we consider the flood storage function de novo. In evaluating whether a wetland provides significant flood water storage, Section 5.1 of the VWR directs that a wetland will be significant if it makes "an important contribution to: reducing risks to public safety, reducing damage to public or private property reducing [sic] downstream erosion or enhancing the stability of habitat for aquatic life." To make this assessment, Section 5.1 provides that we shall consider the extent to which the wetland performs the following three sub-functions:

a) reduces the magnitude or frequency of risks to public safety or of damage to public or private property due to flood water or stormwater runoff;[6]

---

[6] Section 5.1(a) of the VWR directs personnel to consider several factors in determining whether the wetland provides this sub-function, including:

(1) The wetland's significance relative to other water storage capacity in its own watershed or in the watershed of any watercourse to which it is tributary. In particular, available water storage capacity upstream of the wetland should be considered.

(2) Whether the wetland is contiguous to a lake or pond which would provide storage benefits independent of the wetland.

(3) The extent of development and impervious surface in the watershed.

12

b) attenuates flood peaks and reduces water velocities, thereby reducing scouring and erosion; and

c) maintains the geomorphic stability of important habitat for aquatic life by attenuating peak flows of flood waters or stormwater runoff, or reducing the scouring and erosion of stream banks, or both.

In evaluating the flood storage capacity of the Lot 15 wetland, Ms. Lapierre, ANR's wetland ecologist, considered the VWR and employed the Wetland Evaluation Form to aid her analysis. She then compared her assessment using the Wetland Evaluation Form with the New Hampshire method. While she did find that the wetland provided some stormwater storage capacity, she determined that the wetland was isolated, does not receive a large volume of stormwater from the watershed, and does not receive floodwaters from any watercourse. She therefore concluded that the conditions of the wetland and its surroundings did not warrant a finding of significance.

Appellants contend that the wetland is not isolated and receives and stores a significant amount of stormwater, arguing that ANR's determination fails to account for key aspects of the wetland's flood storage function. First, Appellants claim that the wetland receives significant stormwater through underground seepage, which ANR failed to account for by only considering above-ground runoff. Second, Appellants argue that ANR's assessment was flawed because it did not include hydrogeological and hydrologic data, which, as provided by Mr. Torizzo (Appellants' stormwater expert), demonstrates that the wetland does significantly reduce peak flows to Patrick Brook.

After considering the evidence and credible testimony in light of the factors identified in Section 5.1, we conclude that ANR's determination was correct and that the wetland does not provide significant flood and stormwater storage.

---

(4) The history of damage to public and private property and economic loss due to flooding within the watershed downstream of the wetland.

(5) The characteristics of development and resources in or near the floodplain downstream of the wetland.

(6) The extent to which the wetland's water storage capacity is created by beaver dams and similar temporary conditions.

Turning to the first factor, we conclude that the wetland does not significantly reduce any risks to public safety or damage to property from flooding. [7] The wetland is not adjacent to Patrick Brook, and cannot act as a buffer if the Brook floods. As for reducing the volume of water flowing into Patrick Brook in heavy rain, as Ms. Lapierre credibly testified, the wetland is relatively isolated and does not receive significant stormwater runoff from the surrounding watershed. The impervious surface within the watershed is adjacent to or below Lot 15, and much of the runoff from the commercial subdivision flows away from Lot 15 and reaches Patrick Brook through a series of ditches, swales, and culverts. While Appellants claim that the wetland receives significant water through underground seepage, we find this claim unsupported by the credible evidence. Some sub-surface seepage of water may occur, but the small volume of water the wetland receives as a result of the seepage does not significantly reduce risks of flooding on adjacent properties or in streams and rivers in the watershed. Additionally, higher in the watershed, the land is forested and there are larger wetlands contiguous to streams that store a comparatively larger amount of floodwater, thus the wetlands overall flood storage capacity in the larger watershed is minimal.

Next, we do not find that the Lot 15 wetland significantly attenuates flood peaks and reduces water velocities. As discussed above, the wetland does not receive significant volumes of stormwater runoff from the watershed, and much of the surrounding watershed drains to Patrick Brook via ditches and culverts that bypass the Lot 15 wetland. Therefore, we conclude that the wetland does not significantly reduce peak flows to Patrick Brook. While Appellants point to their post-development hydrological models as evidence that the wetland does reduce peak flows, we do not find Appellants' evidence alters our conclusion. Appellants' analysis considers the peak discharge from Lot 15 during a 100-year storm after the addition of over an acre of impervious surface. This is not the proper comparison to assess the wetland's current flood storage capacity. A wetland will store more water than a large parking lot, yet that fact alone does not support the conclusion that the existing wetland's storage capacity is significant. A more appropriate comparison would between the current wetland and a similarly sized

---

[7] We note that while there is a history of flooding on the adjacent Dark Star property, its flooding issues are largely independent of the Lot 15 wetland's ability to store water. In fact, with the Project and the elimination of some of the wetland, the Dark Star property will receive less stormwater runoff than it does today.

14

upland field.   As a result, we find Appellants' reliance on the volume of water discharged from Lot 15 post-development, does not provide an accurate assessment of the wetland's current flood storage capacity, nor does it demonstrate that the current storage capacity is significant.

Lastly, there was little evidence concerning the wetland's ability to maintain the geomorphic stability of important habitat for aquatic life by attenuating peak flows.  But, as we find that that the wetland does not receive significant flood water and therefore does not attenuate peak flows to a significant degree, we conclude that any ability of the wetland to maintain geomorphic stability of important habitat for aquatic life is slight and does not warrant a finding of significance.

We therefore answer Appellants' Question 3(h) by concluding that the flood water and storm water storage capabilities of the wetland on Lot 15 are not significant and do not make an important contribution to reducing risks to public safety, reducing damage to public or private property, reducing downstream erosion, or enhancing the stability of habitat for aquatic life.

### 2. Surface and Ground Water Protection

Section 5.2 of the VWR provides, "Wetlands that make an important contribution to the protection or enhancement of the quality of surface or of ground water are significant wetlands." In evaluating the wetland's water quality function, we are directed to consider the extent to which the wetland:

a. Recharges a drinking water source, such as a well head or source protection area.

b. Reduces levels of contaminants in surface waters which recharge underlying or adjacent groundwaters.

c. Contributes to the flows of Class A surface waters.

d. Enhances or protects water quality through chemical action, by the removal of nutrients, by the retention or removal of sediments or organic matter, or by moderating the adverse water quality effects of soil erosion or stormwater runoff.

e. Contributes to the protection or improvement of water quality of any impaired water.

f. Is adjacent to surface waters, especially impaired waters.

ANR determined that the wetland does not measurably contribute to any of the listed factors, and thus found that the water quality function provided by the wetland was not significant. Appellants challenge this conclusion through their Question 3(e), (f), and (g), arguing that ANR failed to identify many of the Section 5.2 functions provided by the wetland, including: that the wetland recharges a source protection area; filters significant amounts of E. coli; and provides vegetation that absorbs contaminants and provides soil stability.

For the following reasons, we agree with ANR's conclusion and find that the wetland does not provide the water quality function to a significant degree. First, while the wetland is within a mapped source protection area, a layer of clay below the surface of the wetland significantly impedes surface waters from recharging groundwater. Second, although the wetland likely does filter contaminants to some degree, its impact is not substantial. The wetland does not receive large volumes of runoff from the surrounding watershed, and ditching and other disturbances have reduced the wetland's ability receive and filter surface water.[8] As the Wetland Evaluation Form provides, "The surrounding land use, previous development, and cumulative impacts may play a role in the current function of the wetland." ANR Ex. 7. Third, there are no Class A surface waters in Hinesburg. Fourth, the wetland vegetation does eliminate some pollutants and sediments in surface water as it flows over the wetland, but to no greater degree than a fallow upland field, and the grass swales that convey water from the wetland to Patrick Brook provide a similar benefit, and thus we find this factor, while present, does not warrant a finding of significance. Fifth, although the LaPlatte River is impaired by E. coli, there is no evidence that the wetland receives waters contaminated with E. coli, thus any filtering function served by the wetland will not significantly contribute to the protection of the LaPlatte River. Lastly, the wetland is not directly adjacent to any surface water. Therefore, we answer Appellants' Questions 3(e), (f), and (g) with the conclusion that the wetland's surface and ground water protection function is not significant.

---

[8] Appellants highlight the presence of a sand lens below the wetland that filters water as it seeps from the canal and travels below the surface to Patrick Brook. The evidence Appellants rely on is largely speculative and we do not find the presence of the sand lens warrants a finding of significance.

f.       Other Functions

Appellants' Questions 3(i), 3(j), and 3(k) challenge ANR's determination that the wetland only provides two functions, arguing that the wetland's open space and aesthetic function (Section 5.9 of VWR) and the recreational value and economic benefit function (Section 5.8 of VWR) are present and significant.  We understand Appellants' argument to be that the wetland provides the open space and recreation functions because pedestrians "recreating" on the canal path enjoy looking at the undeveloped wetland field and the presence of the undeveloped wetland contributes to the frequency that pedestrians use the path.  This claim boils down to the reasonable assertion that it is more pleasant to look at and walk next to an undeveloped field rather than a large grocery store.  Despite our agreement with this sentiment, we conclude that the wetland does not provide either function to a significant degree.

1.       Recreational Value and Economic Benefit

Section 5.8 of the VWR provides: "Wetlands that provide substantial recreational values or economic benefits are significant wetlands." In evaluating whether the wetland provides a significant recreational value and economic benefit, Section 5.8 specifies that we shall consider the extent to which the wetland: a) is used for, or contributes to, recreational activities; b) provides economic benefits; c) provides important habitat for fish or wildlife that can be fished, hunted or trapped under applicable state law; and d) is used for the harvesting of wild foods.

There is no evidence that the wetland provides an economic benefit, provides important habitat for fish or wildlife that can be fished, hunted or trapped under state law, or that the wetland is used for harvesting wild foods.  Appellants' assertion appears to rest on their claim that the wetland contributes to recreational activities because it provides a pleasant setting for users of the canal path.  But this recreational benefit is not specific to the wetland's status as a wetland, but rather is attributable to the current undeveloped state of Lot 15. Moreover, there is no difference between the open space value provided by the wetland and the upland portion of Lot 15.  Considering the context of the wetland and the canal path, a commercial subdivision, we conclude that the wetland's contribution to recreational activities is minimal and does not warrant a finding of significance.

2.      Open Space and Aesthetics

Section 5.9 of the VWR provides that "Wetlands that contribute substantially to the open-space and aesthetic character of the landscape are significant wetlands." In determining whether a wetland is significant for this function, Section 5.9 directs this Court to consider the extent to which the wetland: a) can be readily observed by the public; b) possesses special or unique aesthetic qualities; c) has prominence as a distinct feature in the surrounding landscape; or d) has been identified as important open space in a municipal, regional or state plan.

Based on the four factors in Section 5.9, we find no support for Appellants' suggestion that the open space and aesthetic function of the wetland warrants a finding of significance. The value Appellants identify related to this function stems not from Lot 15's wetland characteristics, but rather from the fact that it is currently an undeveloped field. Further, this aesthetic value is also provided by the upland portion of Lot 15 and there is no meaningful distinction between the value provided by the wetland compared to the surrounding undeveloped land. While we do not doubt that users of the canal path enjoy the current undeveloped state of Lot 15, the four factors we are directed to consider do not support a finding of significance. The wetland, while observable by the public from Mechanicsville Road and the canal path, is part of the last undeveloped lot of a commercial subdivision and surrounded by development. There are no special or unique aesthetic qualities of the wetland; but rather, it is largely covered by the invasive reed canary grass. Lot 15 currently has prominence in the immediate context of the subdivision because it is undeveloped, but the wetland itself has no distinctive features and its observable characteristics provide no indication of any unique wetland significance. When the area considered is expanded beyond the Commerce Park subdivision, the wetland's prominence is diminished. Lastly, Lot 15 has been slated for development for many years and the wetland portion of Lot 15 has not been identified as important open space to be maintained. We therefore find that even if we consider this function to be present, it is not provided to a significant level.

We therefore answer Appellants' Questions 3(i), 3(j), and 3(k) with the conclusion that the wetland does not provide the recreation function or open space and aesthetic function to a

18

significant degree, and therefore, even if present, these functions does not support a finding that the wetland is significant.

g.      <u>Presence of Multiple Non-significant Functions</u>

Appellants' also argue that Sections 2.30 and 5 of the VWR require the wetland be classified as significant (Class II) because the wetland provides multiple functions, although none to a significant degree (Question 3(l)). Here, Appellants are challenging ANR's interpretation of its own regulations, suggesting that the regulations or statute dictate that, where numerous functions are present in a wetland yet none to a significant degree, it is nonetheless appropriate to find the wetland significant. We reject this assertion.

Section 2.30 of the VWR provides:

Significant Wetland means any Class I or Class II wetland that merits protection . . . either alone or in conjunction with other wetlands, based upon an evaluation of the extent to which it serves one or more of the functions and values pursuant to 10 V.S.A. § 6025(d)(5)A)-(K) and section 5 of these rules. In making this determination, consideration shall be given to the number of or extent to which protected functions and values are provided by a wetland or wetland complex.

Section 5 includes the ten functions that are to be considered and begins by directing that:

In evaluating whether any wetland is a Class II or Class I wetland, the Secretary or Panel shall evaluate the functions that the wetland serves both as a discrete wetland and in conjunction with other wetlands . . . . Consideration shall be given to the number of and/or extent to which protected functions and values are provided by a wetland or wetland complex.

ANR's interpretation of Sections 2.30 and 5 of the VWR is entitled to deference. ANR's practice is that only wetlands that provide one or more of the listed functions in Section 5 to a significant level warrant protection as a Class II wetland. Appellants provide no authority demonstrating that ANR's position should be rejected. Furthermore, the plain reading of Section 2.30 and 5 does not compel the outcome Appellants seek. As we have already discussed, we find ANR's determination that the Lot 15 wetland provides no function to a significant level supported by the evidence. Therefore, because we defer to ANR's interpretation of Sections 2.30 and 5 of the VWR, we answer Appellants' Question 3(l) by

19

concluding that the presence of multiple functions does not make the wetland significant if none of those functions are provided to a significant degree.

## **Conclusion**

For the foregoing reasons, we conclude that the wetland on Lot 15 is properly classified as a Class III wetland.

A Judgment Order accompanies this Merits Decision. This concludes the matter before the Court.

Electronically signed on April 12, 2016 at 09:25 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division